Judge Hughes will not be with us this morning, but he will be listening to the tape and fully participating in the case. We have five cases on the calendar this morning, three from the PTAB and two from district courts, one of which is being submitted on the briefs and will not be argued. The first case is Hackett Intelligence v. Juniper Networks and Palo Alto Networks, 2022, 1938, 1400, 1401, etc. Mr. Bullwinkle, please proceed. Good morning, your honors, and may it please the court. Alan Bullwinkle on behalf of Hackett Intelligence. There are three main points that I would like to address today. First, the board erred in its construction of conversational flow by omitting portions of the patentee's definition. And second, based upon this erroneous construction, the board improperly found that Riddle discloses conversational flows. And finally, the board properly found that petitioners failed to carry their burden to show that Wakeman discloses the associated cash subsystem. Turning to my first point, the board erred by failing to adopt the patentee's explicit definition of conversational flow. Instead, the board only adopted a portion of that definition. The portions that the board did not include are all exemplary. They don't seem to be limiting in any way. How would the scope of the claim change at all if the board had added the exemplary language you wanted? The portions that the board excluded highlighted the importance of participants to a conversation. The language excluded provided an example of an activity. For instance, the running of an application on a server as requested by a client. And then later it explains that some conversational flows involve more than one exchange of packets between a client and a server. So these portions that the board excluded highlight the conversational nature of a conversational flow. They have particular participants, a server and a client. Is highlighting the importance of certain elements that are already in the construction that the board did adopt, does it do anything to claim scope? It does here, Your Honor, because the board found, based upon its construction, that conversational flow is not limited to a single user or client. So in essence, the board found that a conversational flow doesn't have any relation to the participants in the conversation. Instead, it only relates to the activity, which it viewed as the type of application or protocol at issue in the network communications. How does your construction limit to just a single user? What portion of your proposed construction would have that impact? For instance, the running of an application on a server as requested by a client describing an activity. The board's understanding of an activity is so broad that it ignores the participants in the conversation. The board has viewed a conversation as being any network traffic related to a particular application, regardless of the participants. And the specification confirms that the participants in a conversation are an important part of the conversational flow. And this is shown in the SAP example, which is what the board used as its justification for its construction and its interpretation that conversational flows are not limited to users or clients or the participants. And in the SAP example, this involves two connections. And the idea here is that within SAP, the applications that are available, they have a dynamic address. So if you want to print, you have to ask the SAP server, where is the print service? And you get an address, and once the client has that address, it can then make a print request. And so the client number one can make a request, get the address of the print server, and then submit its print request. That would be two different connections. But the packet monitor would recognize these two connections are related, and therefore are both part of the same conversational flow. And this is explained in the provisional at appendix 2503, lines 25 to 30. It says these two packet exchanges, these two connections, would then be correctly identified as being part of the same flow if the clients were the same. So it was important to note that the clients there were the same. And the 099 patent specification also clarifies this same point. At appendix 1319, column 3, lines 1 through 6, it says if the clients were the same, the two packet exchanges would then be correctly identified as being part of the same conversational flow. So that's highlighting the importance of the participants in the conversation. Now another scenario, these same two packet exchanges. You have client number one requesting the address of the print server. It gets that address. Well, client number two overheard that address, and so now client number two knows the location of the print server. Because it knows that location, it doesn't need to ask for it. So client number two can now submit a print request directly without asking for that address. And the specification talks about that sequence of exchanges. And it explains that the packet monitor would recognize that client number two's communication with the print server. It would recognize that as a print activity. Because the packet monitor also previously saw that the SAP server said if this port gets used, it corresponds to the print activity. So that's a dynamically assigned port. It can change over time. And the importance here is that the monitor has the ability to recognize that client number two is engaged in a print activity. You want to talk about RIDDLE, the reference? Yes, Your Honor. So the way RIDDLE works is RIDDLE organizes traffic according to what it calls traffic classes. And traffic classes are defined according to a traffic specification. And so figure 2A at appendix 1900 of RIDDLE shows an example of some traffic classes. One of the traffic classes there is a web traffic class. Another one is FTP, or file transfer protocol. And so the way RIDDLE works is it gets a packet and it will compare that packet to the traffic specifications for these traffic classes. And when it gets a match, that packet belongs to that traffic class. So to the extent that RIDDLE sees web traffic from various clients on the network, it would recognize that web traffic and put it in the web traffic class. The problem with RIDDLE and why RIDDLE doesn't teach or disclose conversational flows is that RIDDLE does not discern between the participants in the conversation. RIDDLE doesn't really understand the notion of conversations. Instead, it's just looking at a packet. Does it match this traffic specification? And if it does, it belongs to that traffic class. Petitioners have highlighted that RIDDLE can also have traffic classes that are specified for a predefined client. But that doesn't cure RIDDLE's deficiencies. Because even if you take, for instance, that FTP traffic class in Figure 2a, you could define that traffic class to only relate to a specific client. Well, at that point, RIDDLE, anytime it sees FTP traffic involving that client, it's going to recognize that traffic as belonging to that class. But that client could engage in multiple file transfer conversations throughout a given day. So maybe there's a file transfer in the morning. That's a conversation. There's another file transfer in the afternoon. That's a different conversation. RIDDLE doesn't make that distinction. It would treat them all as being the same. And so for that reason, RIDDLE does not recognize conversational flows. And an independent reason that RIDDLE does not teach conversational flows is RIDDLE teaches that its traffic classes are directional by nature. At Appendix 1907, Column 8, Lines 50 through 53, RIDDLE says traffic classes have the property of being directional. I.e., all traffic flowing inbound will belong to different traffic classes and be managed separately from traffic flowing outbound. So RIDDLE says the traffic classes are directional. And it confirms that at another location, Column 10, starting at Line 59, it says network traffic is automatically classified under existing classes, beginning with the broadest classes. Didn't the Board read RIDDLE as encompassing both unidirectional and bidirectional traffic? It did, Your Honor. And what's our standard of review of the Board's reading? The Board's factual findings are reviewed for substantial evidence. So isn't there substantial evidence to support the Board's conclusion there? No, Your Honor, because RIDDLE defines its traffic classes as being directional, and the Board didn't even address that definitional language. So because RIDDLE is unable to group traffic that is bidirectional, that's an independent reason that it doesn't disclose conversational flows, because the Board's construction and Patent Owners' proposed construction say that conversational flows are the sequence of packets in any direction. And so that means to be able to recognize a conversational flow, the packet monitor has to be able to recognize and organize traffic going in either direction. Unless Your Honors have any further questions, I'll reserve my time for rebuttal. We will save it for you. Thank you. Mr. Hallwood-Driemeier, you're going to take seven minutes? Yes. Thank you, Your Honors. May it please the Court, Doug Hallwood-Driemeier, on behalf of Palo Alto Networks. I'm going to be addressing packet intelligence's appeal. My colleague will be addressing our cross-appeal. With respect to the claim construction issue, as Your Honor recognized at the start, the language that was supposedly omitted is exemplary only. It is not limiting. We know this in part because not only does the claim language emphasize the relationship to an activity, we also have the primary example that the patent gives and the specification gives, which is the SAP example. If that discussion of SAP stopped where Packet Intelligence's counsel stopped with referencing the recognition or identifying of two connections between the same client and server as being a conversational flow, they might have a good point. But that's not where it stops. It continues on Column 3 after discussing other examples beyond SAP that also reflect disjointed connections, disjointed being in the example of SAP that second connection, which the specification references as being independent of the first because it's a different client. It recognizes this as an example of a disjointed connection, discusses other examples of applications that have disjointed flows, and then comes back to SAP. This is in Column 3 at line 44. Considering the previous SAP example again, because one of the features of the invention is to correctly identify the second exchange as being associated with a print service on that server, such exchange would be recognized if the clients were not the same. On the first instance, referred to by Packet Intelligence, there's a conversational flow recognized where the client and server are the same. But in the latter, they are recognized as associated even though the second client is independent or disjointed. And then it continues to specify that this is, in fact, what is claimed as being inventive. What distinguishes this invention from prior ART Network monitors is that it has the ability to recognize disjointed flows as belonging to the same conversational flow. So it doesn't just recognize them as associated in some other ambiguous way. It recognizes them as associated in a conversational flow. So the second independent, i.e., disjointed connection between the second client and the server is part of the same conversational flow together with the first. And that's what's claimed as being inventive. So the board followed that construction, followed the specific definition that's given. Of course, that's also consistent with how we would generally understand the nature of the term conversation. We are engaged in a conversation even though there are three participants, two judges and one counsel. We aren't having one conversation and we having a second conversation. It's a single conversation. And if they had wanted to somehow limit this, to distinguish it from that common understanding, they would have to have been clear. And they didn't because they don't reference the notion of points in the definition. Instead, again, they reference the activity. In our example, the SAP print request, in which there are two clients each making print requests. In your view, would the claim scope be any different under the patent owner's proposed construction than under the board's construction? Well, under the patent owner's description, they're trying to exclude the instance in which there is the second client who joins the conversation. They're trying to exclude that because they wrongly believe that RIDDLE doesn't disclose it. The result is going to be the same because, as the board found, RIDDLE also discloses connections on multiple flows, multiple connections between a single client and a single server. So even on their definition, RIDDLE discloses this. And I can turn to that as well. The board found, this is on A39, that RIDDLE's disclosure of all traffic in a particular conversation between a client and a server is classified into a single service aggregate teaches bidirectional exchange. This characterization is clearer even than the definition in reflecting the particular limitation. The board cites for that proposition, RIDDLE at A1909, this is column 11, lines 10 to 19, a service aggregate, which is how RIDDLE characterizes a conversational flow, is provided for certain applications that use more than one connection in a particular conversation between a client and a server. For example, an FTP client in conversation with an FTP server employs a command channel and a transfer channel. And on column 13, lines 54 to 59, there's a further explanation of the command channel, which discloses that an FTP session has one flow that is used to exchange commands and responses, and a second flow that is used to transport data files. So RIDDLE is explicitly disclosing between a particular client and a particular service a conversational flow that has multiple connection flows, one of which is clearly bidirectional because it's the exchange of commands. The patent owner says that there are some institution decisions, maybe in other IPRs, where the board said RIDDLE's classification occurs serially on individual packet-by-packet basis, rather than relying on state transitions across multiple packets. Is it correct that the board said that elsewhere of RIDDLE, and does that impact our decision? The board in an institution decision, which of course is by definition non-final, there's no opportunity to seek review of that, and it's just their view at the particular time before having a full trial. So I would distinguish it and say it's not binding on this court, or even on the board, as the board panel recognized here. But further, the board distinguished those earlier non-institution decisions because they concerned a different limitation. The limitation at issue there, and this is in the 099 patent, column 35, lines 31 to 39, was to store a set of predefined state transition patterns and state operations such that traversing a particular transition pattern as a result of a particular conversational flow indicates to particular conversational flow. So it's a different limitation. Totally different language there. I think I understand the answer. And it's all about transitions between flows and between states, which is not, of course, an issue here. And so whatever the board had said with respect to the prior art not disclosing that has nothing to do with these limitations. I think I have to interrupt this conversational flow. Your time has expired.  We'll hear from Mr. Sigler now. Good morning, Your Honors, and may it please the court.  And I'll be arguing the cross appeal on behalf of both petitioners here today. Substantial evidence doesn't support the board's finding that Wakeman fails to teach an associative cache. That finding is contrary to the undisputed evidence. It's undisputed that Wakeman teaches a CAM cache. It's also undisputed that associative caches were well-known and not novel. It's also undisputed between the experts that an associative cache would be selected when the need for performance outweighs cost. Patent owner's expert, Ms. Quigley, stated that at A1768-69. And our expert, Dr. Weissman, agreed with that point at A1694. You didn't spend a lot of time talking about Wakeman. Well, Your Honor, I know that was a piece of the board's decision here. And respectfully, Your Honor, the board overlooked the discussion of Wakeman in discussing the prior element of Claim 1.3. There was a good deal of discussion there. The petition, for example, provided an overview of Wakeman at A782-85. And then detailed Wakeman's CAM cache scheme for Claim 1.3 at A812-814. And then our discussion with respect to the claims at issue here, such as Claim 3 on the 646 patent, referred back to that earlier discussion. And, of course, our expert provided conclusions there based on Wakeman and that earlier discussion. And here, Your Honors, it's also important to note that the undisputed evidence shows that Wakeman itself prioritizes performance. Wakeman talks about providing faster forwarding speeds through its CAM cache. Thus, Wakeman teaches an associative cache here. That's what the undisputed evidence shows. An associative cache, as the experts agreed, is defined by an absence of a policy that restricts where data may be cached. And the experts also agreed that Wakeman doesn't make that restriction. Again, that's found in the appendix. Dr. Quigley's opinion at A1768-69, and Dr. Weissman as well at A1734. So even if Wakeman discloses associative cache, what about the findings on the no motivation to combine? I think Wakeman talks about the, and you've already alluded to it, the tradeoff, perhaps, between performance and expense. Isn't that a fair consideration? And isn't that part of what the board's analysis was? Well, two responses to that, Your Honor. First, the board found that there was motivation to combine Riddle and Wakeman with respect to other claims here. So that was part of the board's finding. Secondarily, the board did also find that Wakeman doesn't teach away. The board rejected that argument in its opinion. And as we detailed in our briefing, there's multiple opinions from this court holding that cost isn't sufficient in itself to outweigh the considerations of performance. But it's a permissible factor in assessing motivation to combine, isn't it? Sure, Your Honor. And here we're just talking about a simple binary design choice that one of ordinary skill in the art would face. It's the usual, the paradigm design choice in computer science, right? We're trading off cost versus performance. Did the board make a factual finding that there were only those two options? The board did not, Your Honor. But the record evidence below shows that there are only those two options. And logically, there's only those two options, Your Honor. Well, I think for that, are you just relying on the expert statement that you quote in the briefs? Both expert statements, Your Honor. Both experts. Our expert and in our petition addressed that an associative cache was well-known and using one was a routine engineering design choice. Their expert came back in the response and raised the alternative design choice of a direct mapping cache. But I didn't see, but you can point me on the record if I missed it, where their expert said those are the only two options. She did not say that, Your Honor. Not explicitly. But logically, that's the case here. You have two different choices here. You have a cache that limits where cache values are stored. That's direct mapping. And you have a cache that doesn't limit where cache values are stored. That's associative. Either it does or it doesn't. And there's no other evidence in the record of any other cache that would apply to this situation. We're talking about a cache mapping scheme. It either restricts or it doesn't. Here, one of ordinary skill in the art would understand from Wakeman that it doesn't restrict and it's teaching an associative cache. That's what the undisputed evidence shows. And I see that I'm eating into my rebuttal time. I'm happy to answer further questions now. Otherwise, we'll reserve. We'll save your rebuttal time. Of course, it's only to be used in response in reply on the cross field. Thank you, Your Honor. Mr. Bullwinkle. Thank you, Your Honors. Alan Bullwinkle on behalf of Packard Intelligence. I'll start first with the cross appeal issues that were raised. First of all, it's not undisputed that an associative cache was well known. There's no record evidence to support that position. In the petition, the petitioners say an associative cache was a well-known cache design paradigm. And that's at Appendix 830. To support this proposition, they cite to the 646 patent specification, which is describing an embodiment of the cache. And that description doesn't say that this is a well-known cache design at all. And the other support they point to is their expert's testimony. Their expert uses the exact same language. An associative cache was a well-known cache design paradigm. But there's no support for that statement. Their expert also cites to the 646 patent specification, which can't be used to support that, and it doesn't support that statement. Counsel referred to the fact that Wakeman was discussed regarding previous limitations. But if you go look at the discussion of Wakeman, their expert's testimony on that fact, and even Wakeman's teachings, it never talks about an associative cache or that an associative cache is well-known. And then also regarding the there's only two design choices, that's not supported by the record either, Your Honor. The petitioner's expert said an associative cache or any other type of well-known cache, he didn't say that there's only one other type. He said any other type. And the implication there is that there are many other types. He didn't enumerate them. At the end of the day, the board found that petitioners failed to substantiate conclusory testimony regarding whether or not an associative cache was well-known. And that finding should be affirmed. Turning back to the SAP example that counsel was discussing, the board, when it was dealing with the second client getting involved, the board pointed to the language that counsel identified. It said they would even be recognized if the clients were not the same. But that statement doesn't say that they would be recognized as being in the same conversational flow. The first statement said if the clients were the same, then they would be recognized as being in conversational flow. The second statement is really speaking to the fact that the packet monitor knows that when a client communicates with this dynamic port over here, that that is a print activity. That's the recognition, the recognition of the application type. Counsel also analogized the conversation that we're having here to what Riddle is recognizing. But really in that context, the way Riddle works is we are having a conversation here and there are specific participants in that conversation. And you could say the type of conversation we're having is a federal circuit oral argument. While downstairs in a couple of other courtrooms, there are also some federal circuit oral arguments that are going on. Those are different conversations and they have different participants. Riddle would treat them all as the same conversation. And that's not the case. There's multiple conversations going on here. We have one going on here. There's another one downstairs. And Riddle would not be able to distinguish between those. It would say these are federal circuit oral arguments. They all belong in the same bucket. So in conclusion, the board's finding on conversational flow completely ignored the conversational nature of a conversational flow. A conversation has particular participants and the board wiped that out. First, by omitting the patentee's full definition, which highlighted the importance of those participants. And second, by applying that construction so broadly to find that Riddle teaches conversational flows. But the board's finding as to Riddle cannot be supported in light of its erroneous construction. Thank you, Your Honors. Thank you, Counsel. Mr. Sigler has a few minutes on the cross-appeal. Thank you, Your Honors. I'd like to address three items in response to Patent Owners' Counsel. First of all, an associative cash was well known. The specifications here of the patents at issue show that. They don't explain what an associative cash is or say how to implement one. They just say it's an associative cash and the expectation is that one of ordinary skill in the art would know what one of those is and know how to implement it in this process. It's just like what we saw in this Court's decisions in the CRFD and Uber cases. It's a well-known concept in the art and one of ordinary skill in the art would have known how to implement it. Secondly, Your Honors, our expert, Dr. Weissman, did explain below that a person of ordinary skill in the art would have understood that Wakeman provides an associative cash due to not disclosing any restrictions, as I described before. You can find that at A1734-35. Third, counsel referenced a snippet from Dr. Weissman's declaration below where he mentioned other types of caches. If you look at where he made that statement, that's on A1735. What he's talking about there is just that a person of ordinary skill in the art would have understood and had the ability to implement many different types of caches. Caches were well known. He's just making the statement that in general caches were well known and one of ordinary skill in the art would have had it in their skill set to implement them. With that, Your Honors, I'm happy to answer any further questions. Otherwise, I'd close by again stating that there's not substantial evidence to support the Board's finding here and that reversal is the appropriate remedy on these two claims. Thank you, counsel. The case is submitted.